DECISION AND JOURNAL ENTRY
{¶ 1} Defendant, Christopher E. Dunn, appeals from the judgment of the Wayne County Court of Common Pleas which found him guilty of aggravated vehicular homicide. We affirm.
 {¶ 2} On January 6, 2003, Defendant's semi tractor-trailer struck a GMC Safari van, killing its 16 year-old driver. Within the month, Defendant was indicted for aggravated vehicular homicide in violation of R.C. 2903.06(A)(2).
 {¶ 3} In March of 2003, Defendant filed a motion to preserve evidence and a motion to prevent destruction of evidence, specifically aimed at preventing tampering with the semi-tractor trailer which Defendant was driving at the time of the accident. The trial court did not rule on these motions, and the police removed the semi-tractor trailer from the owner's property on more than one occasion to conduct additional inspections and measurements on the vehicle. Defendant insists that the reports made by the police regarding the vehicle's brakes do not correspond with the condition of the vehicle at the time he was finally able to inspect it.
 {¶ 4} Defendant also filed a motion for change of venue due to extensive pretrial publicity. In support, Defendant attached copies of seventeen different newspaper articles in the locality which detailed the accident. The court denied the motion.
 {¶ 5} Prior to trial, Defendant also filed a motion in limine seeking to exclude any reference to defects with the semi-tractor trailer, including its brakes, which had been corrected by Defendant prior to the date of the accident. Defendant alleged that such information was both irrelevant and highly prejudicial. The court granted Defendant's motion only in part, and permitted the State to introduce evidence of vehicle defects which were documented between August 2002 and January 6, 2003.
 {¶ 6} Following a trial, a jury found Defendant guilty of aggravated vehicular homicide. The trial court sentenced Defendant to three years in prison, imposed a lifetime suspension of Defendant's CDL and a ten year suspension of his driver's license, and ordered Defendant to pay restitution in the amount of $31,734.19. Defendant timely appealed raising five assignments of error.[1]
 ASSIGNMENT OF ERROR I
"The evidence at trial concerning the element of `recklessly' was insufficient to support [Defendant's] aggravated vehicular assault conviction, and that conviction was against the manifest weight of the evidence."
 {¶ 7} In his first assignment of error, Defendant argues that his conviction was not supported by sufficient evidence and against the manifest weight of the evidence. Specifically, Defendant asserts that the State failed to show he was reckless as required by the statute because he: (1) was driving under the posted speed limit, (2) was not under the influence of drugs or alcohol, (3) was only sixty feet from the intersection when the traffic light turned yellow so that he could not have stopped his vehicle before the intersection regardless of the condition of his brakes, and (4) braked, swerved and sounded his horn in an attempt to avoid the accident.
 {¶ 8} Sufficiency of the evidence produced by the State and weight of the evidence adduced at trial are legally distinct issues. State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52. As to sufficiency, Crim.R. 29(A) states that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." However, if the record demonstrates that reasonable minds may reach differing conclusions as to the proof of material elements of a crime, a trial court may not grant a Crim.R. 29(A) motion for acquittal. State v. Smith, 9th Dist. No. 20885, 2002-Ohio-3034, at ¶ 7, citing State v. Wolfe
(1988), 51 Ohio App.3d 215, 216. "`In essence, sufficiency is a test of adequacy.'" Smith at ¶ 7, quoting Thompkins,78 Ohio St.3d at 386.
 {¶ 9} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v.Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3, citingThompkins, 78 Ohio St.3d at 390 (Cook, J., concurring). When a defendant maintains that his conviction is against the manifest weight of the evidence:
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
This power is to be invoked only in extraordinary circumstances where the evidence presented at trial weighs heavily in favor of a defendant. Id.
 {¶ 10} In this case, Defendant was convicted of aggravated vehicular homicide. under R.C. 2903.06(A)(2) which prohibits one from recklessly causing the death of another while operating a motor vehicle. One acts recklessly when:
"with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." R.C.2901.22(C).
 {¶ 11} In this case, the State and Defendant agree that he was operating a motor vehicle, a tractor-trailer, and that Defendant caused the death of Janine Ramer ("Ramer"). Defendant, however, argues that the State did not show that he was reckless in causing that death. Instead, he asserts that the entire incident was a tragic accident. The State, on the other hand, insists that Defendant was reckless because he ignored the known faulty condition of his tires and brakes.
 Pre-Accident Inspections of Defendant's Semi {¶ 12} During September 2002, Keith Kerns ("Kerns"), an employee of the motor carrier enforcement division of the Ohio State Highway Patrol, conducted a level-two walk-around inspection of Defendant's semi. [2] At that time, Kerns noted some tire defects with the trailer of Defendant's semi. Both right tires on the front trailer axle had exposed cords, and all four tires on the rear trailer axle were under tread wear limitations. Kerns explained that checking tire tread was very important to an inspection because tread is "essential to being able to stop the vehicle[.]" The less tread on a tire, the longer stopping distance would be required for that semi.
 {¶ 13} Kerns placed the semi out of service for those tire violations. That same evening, following the inspection which put his semi out of service, Defendant listed the condition of his vehicle as "satisfactory" in his driving log.[3]
 {¶ 14} Joe Kindt ("Kindt"), another employee of the motor carrier enforcement division of the Ohio State Highway Patrol, conducted an inspection of Defendant's semi on November 20, 2002. Kindt performed a level-two walk-around inspection and discovered a worn tire on the rear trailer axle which was not yet severe enough to put the semi out of service. If the defect remained at the next inspection, however, that defect would place the semi out of service. Defendant's log the night of that second inspection indicated that his semi was in "satisfactory" condition.
 {¶ 15} A motor carrier certification, signed sometime in December, indicated that the tire defect discovered in the November inspection had been repaired.[4]
 The Accident {¶ 16} On the evening of January 6, 2004, five different vehicles, including Defendant's semi, converged on the intersection of Routes 30 and 94. Snow fell. The roads were wet, though salted so that they were neither snow covered nor icy. Jennifer Stoller ("Stoller") and Richard Keyes ("Keyes") were both driving in opposite directions on Route 94, and stopped at the red light at the intersection of Routes 94 and 30 around 7:40 P.M. Stoller, proceeding southbound, was following a maroon van which the victim, Ramer, was driving. She and Ramer stopped at the light on the north side of Route 30. Keyes stopped on the opposite side of Route 30, and recalled seeing Ramer's van across the intersection. Keyes remembered that he could see not only the light which controlled northbound Route 94 traffic, but also the signal which faced westbound traffic on Route 30. Keyes recalled that just as that light for westbound Route 30 turned from yellow to red, a semi went under the light driving very quickly.
 {¶ 17} After taking a moment to think that the semi had "cut it * * * a little too close[,]" Keyes saw the light for Route 94 traffic turn green and began to drive into the intersection. As he began inching forward, he heard an air horn from a truck on Route 30. He looked up to see a semi driving quickly down the hill on Route 30 toward the intersection. A former truck driver himself, he noticed by the noises coming through his open driver's side window that the truck did not sound like it was braking. Rather, he felt he heard it accelerate. Keyes then noticed that Ramer's van had proceeded into the intersection, and watched as the semi on Route 30 swerved in an attempt to miss hitting Ramer's van. The semi, driven by Defendant, however, struck the van. Keyes, whose car was already in the eastbound lane of Route 30 when Defendant's semi struck Ramer's van, immediately pulled his car off to the berm.
 {¶ 18} Stoller's testimony agreed mostly with that of Keyes. She recalled seeing Ramer's brake lights go off, and looked up to see that the light had turned green for traffic on Route 94. She remembered that Ramer's van idled forward into the intersection, and that she followed behind. She was listening to her radio with her windows up and did not hear any horn. Then, she "saw the van basically disappear. It was in the blink of an eye [and] the van was gone and [Stoller] saw the back of a semi truck. [All she could hear was] [t]he impact, metal crashing and a very intense crash." She watched as the semi drove up the hill into the median on Route 30, sending snow flying up onto the road. Ramer's van came to rest perpendicular to the flow of traffic in the westbound lane of Route 30.
 {¶ 19} Statements given by Defendant to law enforcement personnel indicate that he was proceeding west on Route 30 at between 45 and 50 m.p.h. Defendant stated that the traffic light at the intersection of Routes 30 and 94 turned yellow when his semi was approximately 60 feet from the intersection. As he continued forward, he suddenly saw Ramer's van pull out into the intersection in front of him, though Defendant was certain his light was still yellow. Defendant put on his brakes and swerved in a failed attempt to miss the van. He felt the impact, and swerved directly into the median on the west side of the intersection on Route 30.
 {¶ 20} Joseph Puncekar ("Puncekar") was also driving a semi westbound on Route 30 at that time. He recalled that Defendant's semi had passed his, and that Defendant was approximately 600 feet, about 1/8 of a mile, in front of him as Defendant approached the intersection. Puncekar testified that Defendant must have been traveling at about 45 m.p.h. because he was driving at that speed, and Defendant was not gaining any distance away from him as they neared the intersection. Puncekar remembered seeing the light turn yellow because it reflected off of some object in the intersection, which Puncekar believed at the time was the cab of Defendant's semi. He had not seen any other semi in front of Defendant, but admitted that, if one was there, the light may have reflected off of that semi's cab, and not off of Defendant's cab. Almost immediately after he saw the yellow reflection, he saw Defendant's brake lights come on, and Defendant's semi swerve. Puncekar then saw sparks coming from the right side of Defendant's semi, though he did not know what the semi hit or had been hit by. Puncekar pulled his semi off to the side of the road, and only noticed Ramer's van after it came to rest on the opposite side of the intersection.
 {¶ 21} Defendant left impressions on all three witnesses at the scene. Keyes was the only witness on the scene that actually approached the van. He discovered Ramer leaning over on the driver's seat with the driver's side glass broken out around her. She was moving at that time. After an EMT arrived on the scene, Defendant approached Keyes as he walked away from the van, asking Keyes how Ramer was. Keyes "[t]old him not good[,]" and noted with irritation that Defendant was not willing to go over to the van to find out for himself. "[Defendant told Keyes] he would never drive again if it was bad. And then [Defendant] said he tried to stop the vehicle, his truck." Stoller recalled that Defendant said "didn't they hear my horn? And [she] said that [she] hadn't heard a horn. And then [Defendant] walked into the gas station." Puncekar asked Defendant if he was alright, and observed that Defendant "was extremely shook up * * * [and] was afraid somebody was seriously hurt."
 {¶ 22} Ramer was taken to Dunlop Memorial Hospital where, after approximately forty minutes of attempted resuscitation, she passed away. The emergency room physician, Darrell Donald, testified that Ramer died from massive head and severe brain injuries, both consistent with the type of motor vehicle accident which had occurred.
 Investigation of the Accident {¶ 23} Multiple police officers and State Highway Patrol troopers were at the scene throughout the evening. They took statements, photographs, and measurements. Chief of Police, Ryan Pearson, recalled that Defendant was very cooperative at the scene and gave a statement almost immediately after Pearson returned from escorting Ramer to the hospital. Defendant insisted that he did not know of any technical problems with his semi, though he did say that he had adjusted the brakes on the semi only two weeks before and may have adjusted them incorrectly. He was certain they were operating properly at the time of the accident.
 {¶ 24} An accident report, filled out by Trooper Matt Mossor of the Wooster Post State Highway Patrol, indicated that the collision was caused by Defendant's failure to yield at a red light and defective equipment on the semi. A box for defective brakes, however, was not marked. Trooper Mossor also noted that there were no skid or scuff marks on the road. The report listed 74 percent humidity and a temperature of 21.02 degrees, though the Trooper insisted the only snow and ice on the roads was caused by the impact of the semi stirring up the snow and ice from the median.
 {¶ 25} Trooper Mossor also timed the light sequence, and confirmed that sequence with the Ohio Department of Transportation ("ODOT"). Thomas Weidinger ("Weidinger"), the district traffic engineer with ODOT for the area including Wayne County, testified extensively at trial about the operation of the light at the intersection of Routes 30 and 94. The traffic light at the intersection was traffic responsive, and thus the length of the green light in any direction could vary. However, the change and clearance intervals on the light did not change. The change interval, the time which lapses while the light remains yellow, was always five seconds, and the clearance interval, the time which lapses while all lights remain red, was always two seconds.
 {¶ 26} While Weidinger could not verify with certainty that the light was properly working at the time of the accident, the traffic light at that intersection was inspected only a few days after the accident, and was found to be working properly. Weidinger also indicated that it would be impossible for the light to be yellow for Route 30 traffic and green for Route 94 traffic. The light contained a fail safe device that monitored for any conflict. "If there's anything that would make an unsafe operation then [the device] automatically puts the signal into flash mode." In addition, if the light went into flash mode due to such a conflict, ODOT would have to send an electrician to the intersection in order to reset the light. It could not simply reset itself.
 Post Accident Inspections of Defendant's Semi {¶ 27} State Highway Patrol Trooper Larry Eller weighed the semi the evening of the accident on portable scales and found that the semi and its load weighed a total of 71,700 pounds. Ramer's van weighed only 4,650 pounds.
 {¶ 28} Keith Kerns ("Kerns"), a seven year veteran of the Ohio State Highway Patrol motor carrier enforcement division, inspected Defendant's semi at the scene that evening. Kerns first checked Defendant's paperwork, which appeared to be in order. Kerns then conducted a level-one, comprehensive inspection of Defendant's semi. A level-one inspection, Kerns explained, was the most comprehensive of the five types of inspections which he was trained to perform. It involved not only a cursory, walk-around inspection, but an inspection of various mechanical aspects of the vehicle as well. In his walk-around inspection, Kerns noted that a clearance light was out, some reflective tape was missing, and the semi had a completely bald tire on the rear axle — the same axle on which the November report indicated a defective tire.[5]
 {¶ 29} As to mechanical aspects of the vehicle, Kerns checked the push rod movement on all five axles of the tractor-trailer combination. His report showed multiple defects in Defendant's braking system: the steering axle had different size braking chambers on each side, a defect which alone could put the vehicle out of service; the front drive axle was completely ineffective as the brake lining was not coming into contact with the drum, and was also ½ inch out of adjustment; the second drive axle exhibited no push rod movement at all, and the brake lining was not contacting the drum in that axle either; the front trailer axle was properly adjusted and operating; the rear trailer axle had one inoperative brake with no push rod movement.
 {¶ 30} Kerns found all of these defects at the scene on the night of the accident, and indicated to Defendant that the semi should not be driven. Kerns recalled that Defendant told him that "he had been under there probably in the last couple of weeks and he may have adjusted things wrong." Kerns testified that none of the defects could have been caused by the accident. He placed red out-of-service stickers on both the tractor and the trailer that evening, though he stated that the weather was wet and cold enough that the stickers probably would not stick.[6]
 {¶ 31} Kerns observed the semi as it was towed away, testifying that the towing company followed the standard procedure of caging the semi's brakes. The bolt used for caging would effectively preserve the adjustment settings and conditions of the brakes while disabling the parking brake so that the semi could be towed. Kerns watched the towing company hook up the semi and tow it from the scene, and did not recall the company having any difficulty with any of the brakes being locked.
 {¶ 32} Kern's inspection of Defendant's semi, however, was called into question by defense testimony offered by Defendant's step-father, Gregory Ledbetter, who owned the semi, and Dean Stebbins, a tow truck operator. Both testified that the brakes on the second drive axle, an axle which Kerns indicated had inoperable brakes, were actually locked when Stebbins towed the semi from Ledbetter's property sometime in March 2003. Stebbins recalled caging the brakes and pulling out the drive shaft in order to tow the semi for another inspection by the State, and stated that the rear drive axle was locked up. The axle would only turn after the air for the braking system was turned off.
 Accident Reconstructionists {¶ 33} Trooper Raymond Joseph ("Joseph") testified on behalf of the State regarding reconstruction of the accident. Joseph, a commercial vehicle crash reconstructionist employed by the Ohio State Highway Patrol, indicated that he had reviewed approximately 300 crashes over the years, and reconstructed about 15. Joseph took extensive training in crash reconstruction, and also taught reconstruction techniques. Multiple courts in Ohio had previously qualified Joseph as an expert.
 {¶ 34} Joseph explained that the industry standard for air brakes involves between a 70 and 80 percent efficiency. Using standard formulas set by the Institute of Police Technology and Management, an estimated speed of 50 m.p.h., the weight of the vehicle, measurements of the brake components on Defendant's semi, and the results of Kern's inspection of the semi following the accident, Joseph determined that the semi was operating at only 24 percent braking efficiency on the night of the accident. Joseph indicated that this drastically decreased braking efficiency would lead to a 41 percent increase in required stopping time, and a 47 percent increase in required braking distance for a vehicle traveling 50 m.p.h.
 {¶ 35} In order to illustrate what that percentage would mean in practical terms, Joseph explained that a vehicle traveling 50 m.p.h. would cover approximately 65.97 feet per second. A normal vehicle going 50 m.p.h., weighing the same as Defendant's semi, and having a standard braking efficiency, would require 5.91 seconds and 284 feet to stop. However, Defendant's semi on the night of the accident would have required 11.33 seconds and 482.82 feet in order to come to a complete stop under the same circumstances. Given the lighting sequence, with seven seconds passing between the light turning yellow and the opposing light turning green, Defendant, at that braking efficiency and even under the best of road conditions, would have actually needed to begin braking his vehicle 4.33 seconds before the light ever turned yellow in order to stop at the intersection.
 {¶ 36} Joseph stated that he relied heavily on the inspection conducted by Kerns, and that his braking efficiency would be incorrect if those results were not correct. He also explained that his method of calculation did not assign standard braking values to each axle because that method was less accurate. Also, as Joseph was speaking in general terms about any vehicle weighing the same, traveling the same speed, with the same braking efficiency, any errors in the accident report or witness statements would not affect his calculations. He only needed to verify the light sequence and the measurements on the brake drums, both of which were done. The frictional value of the road did not factor into Joseph's calculations — even on the best of roads, the braking efficiency remained the same.
 {¶ 37} Douglas Heard ("Heard") testified for the defense. Heard, who had reconstructed nearly 400 accidents during his career, had qualified previously as an expert on more than 50 occasions. He testified mostly for the defense, though also, on occasion, for the State. Heard insisted that the actual frictional value of the roadway at the time of the accident was vital to helping reconstruct the accident. Joseph's use of an incorrect value, that for a dry instead of wet road, should have skewed his calculations.
 {¶ 38} Heard reviewed the accident report, photographs, statements, and inspection report to evaluate the accident. According to Heard, who had done "a couple" of braking efficiency calculations in the past, the standard for reconstructing braking efficiency actually is based on assigning a set percentage of efficiency to each separate axle. He indicated that "a lot of [people] use that [method] because [they] don't have the luxury of knowing exactly what the numbers are[,]" and that the method was generally accepted by most reconstructionists in the field. Heard's method assigned 5 percent to each side of the steer axle, 9 percent to each side of the two drive axles, and 6 percent to each side of both trailer axles, equaling 70 percent total efficiency if the braking system was working optimally.
 {¶ 39} As to actual reconstruction of this particular accident, Heard first lamented the lack of photographic evidence taken at the scene, indicating that none of the 50 photographs he reviewed were taken on the night of the accident.[7] Heard also explained that there was one important discrepancy in the information that he reviewed which would greatly alter any calculations: were the brakes on the second drive axle actually locked, as testified to by Ledbetter and Stebbins, or were they in fact inoperable, as noted in Kern's inspection? Given these problems in the investigation, and other small discrepancies, Heard stated that he would need more information before constructing how the accident occurred. He simply could not form an educated opinion based on the information available.
 {¶ 40} Heard, however, did prepare a report to determine the braking efficiency of Defendant's semi using the data from Kern's inspection report. He greatly stressed that any calculation would be inaccurate if Kern's inspection results were inaccurate — especially if the second drive axle was completely operable. Heard then admitted that his calculations based on that inspection produced a 23 percent braking efficiency for Kern's semi. This, of course, compared very closely with the 24 percent efficiency calculated by the State's expert, Joseph.
 Application of Reconstruction Numbers {¶ 41} Both Joseph and Heard discussed time and distance in relation to Defendant's ability to stop, or to safely make it through the intersection before Ramer's light had turned green. A vehicle traveling approximately 45 or 50 m.p.h. would cover between 65.97 and 73.3 feet per second. Accordingly, if Defendant saw the light turn yellow when his semi was only sixty feet away from the intersection, his semi would clear the intersection within one second. Given the five second change interval of the light, which was not disputed, the light would remain yellow for an additional four seconds after Defendant cleared the intersection. In other words, both agreed that, according to Defendant's statement, he should have cleared the light at least five or six seconds before Ramer's light ever turned green.[8]
 {¶ 42} The defense expert, Heard, also testified that it would probably have taken Ramer's van between 2.6 to 3.3 seconds to drive from the stop line on Route 94 to the point of impact with Defendant's semi in the westbound land of Route 30. In other words, regardless of his location when Defendant saw the light turn yellow, he would still have between 9.6 and 10.3 seconds to react before Ramer's vehicle was in a direct path in front of his semi.[9] Given this time frame and Defendant's rate of speed, he would have traveled between 633 and 755 feet from the time the light turned yellow until the impact with Ramer's van, not the 60 feet he claimed.[10] Defendant's semi operating at optimal braking efficiency should only have required 284 feet to come to a complete stop when traveling 45 or 50 m.p.h.
 Defendant's Knowledge {¶ 43} The State in this case needed to prove beyond a reasonable doubt that Defendant was reckless. See R.C.2903.06(A)(2). In other words, in order to convict Defendant of aggravated vehicular homicide in this case, the State needed to prove beyond a reasonable doubt that Defendant knew that his brakes were operating at greatly decreased efficiency, and that he disregarded that risk by driving his semi anyway. See R.C.2903.06(A)(2); 2901.22(C).
 {¶ 44} Multiple witnesses in this case testified as to whether Defendant would have had some knowledge of the extremely poor condition of his braking system and tires. First, the November inspection indicated that Defendant's semi had a defective tire on the rear trailer axle. More than one person testified that tires without sufficient tread depth, bald tires, or tires with cords showing, decreased the braking efficiency of a vehicle. While a certification exists stating that tire was repaired, an inspection of Defendant's semi on the night of the accident revealed a bald tire on that same axle. Testimony illustrated that a tire does not become bald overnight. Rather, it takes a long amount of wear for that to happen. It is unlikely that Defendant did not know about the bald tire or its impact, even if minimal, on his braking efficiency.
 {¶ 45} While knowledge of the tire itself is not a major issue, the fact that Defendant, on his own admission, inspected and adjusted his brakes only two weeks prior to the accident indicated he should have seen the defects in his brakes at that time. Both Joseph and Kerns testified at trial that the type of defects found on Defendant's brakes do not simply occur overnight. Rather, "it * * * normally [took] a long period of time to have a vehicle deteriorate like that one had." The defects, therefore, most likely existed at the time Defendant adjusted his own brakes, and he likely knew that they were not in proper repair.
 {¶ 46} Even if, for some good faith reason, Defendant (1) did not know that he had a bald tire on his rear trailer axle and (2) did not notice any braking defects while he was adjusting his brakes prior to the accident, testimony by two witnesses indicated that he must have known something else: Defendant must have known, merely through his day to day driving, that it was taking much longer in both distance and time for him to stop his vehicle.
 {¶ 47} Puncekar, the other semi driver who witnessed the accident and testified for the defense, stated that he would know if the brakes on his semi were beginning to deteriorate. He would easily notice the difference in stopping time and distance required, and would then check to ensure their proper maintenance and repair. In general, when driving 45 m.p.h., he could stop a semi weighing 75,000 to 80,000 pounds within about 250 to 300 feet. That stopping distance included both the distance covered as he reacted, and 150 feet actual braking distance.[11]
 {¶ 48} Joseph also testified that "the vehicle would have exhibited signs prior to [the accident,]" and that Defendant should have known there was a problem with the brakes that made them unsafe:
"[T]he braking efficiency [was] reduced so much that even in normal day to day driving, if he were approaching a traffic light or a stop sign or an exit ramp he would have noticed an additional distance required. He would have also been able to compare coming up to a traffic signal with another truck or another car beside him that as he applied his brakes that other truck was slowing down a lot faster than * * * he was. Or that maybe when he stepped on the brakes he was a little closer to the sign than what he felt he should [have] been. The braking efficiency of this truck [was] reduced 57 percent. Therefore, he's going to notice that the truck that steps on the brakes beside * * * him is stopping in a lot quicker distance. He should have at that point and time * * * had the brakes looked at or had some maintenance done on them."
 Conclusion as to Defendant's First Assignment of Error {¶ 49} The evidence in this case presents a few possibilities. First, that Defendant was sixty feet away from the intersection when the light turned yellow, and Ramer pulled her van out in front of him while she had a red light.[12]
Second, that Defendant was further than 60 feet from the light when it turned yellow, and thought incorrectly that he could get through the intersection before the light turned red. Lastly, that Defendant was further than 60 feet from the intersection, knew that he could not stop his vehicle prior to that intersection, and, as a consequence, ran a red light.
 {¶ 50} This last scenario also leaves one remaining issue: whether Defendant knew that his semi's required increased stopping distance resulted from the faulty condition of his brakes. Both the prosecution and the defense presented evidence as to Defendant's knowledge of those braking defects. The jury, apparently, chose to believe the testimony indicating that Defendant did know that his decreased braking efficiency made his vehicle unsafe; that Defendant would actually have needed to apply his brakes more than 4 seconds before the light ever turned yellow in order to stop at the intersection; and that Defendant disregarded that risk.
 {¶ 51} Where conflicting evidence exists, this Court will not overturn a verdict based on manifest weight simply because the jury chose to believe the evidence offered by the State. SeeState v. Moore, 9th Dist. No. 03CA0019, 2003-Ohio-6817, at ¶ 18, citing State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. A finding that a conviction is supported by the weight of the evidence, also includes a finding of sufficiency of the evidence. Smith at ¶ 9, quoting State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4. Accordingly, we overruled Defendant's first assignment of error.
 ASSIGNMENT OF ERROR II
"The trial court abused its discretion by denying [Defendant's] pretrial motion for change of venue."
 {¶ 52} In his second assignment of error, Defendant argues that the trial court erred by denying his motion to change venue due to extensive pretrial publicity. Defendant asserts that he "was tried and convicted by the local media serving Wayne County before his trial began[.]" Defendant points to the seventeen newspaper accounts published in the locality which "were slanted against [Defendant] and included extremely prejudicial accounts of alleged prior defects and equipment violations of [Defendant's] semi-tractor trailer — which were fixed prior to the accident."
 {¶ 53} Crim.R. 18(B) and R.C. 2901.12(K) permit a court to change the venue of a trial where it appears that a fair and impartial trial cannot be achieved in the county where the trial is pending. Decisions relating to change of venue lie within the sound discretion of the trial court and may only be overturned on appeal on a clear showing of an abuse of discretion. State v.Lee (Aug. 22, 1990), 9th Dist. No. 90CA004749, at 3, citingState v. Fairbanks (1972), 32 Ohio St.2d 34, 37.
 {¶ 54} Examination of the jurors is the best method for determining whether or not the community is so prejudiced that a fair and impartial trial can not be held in that county. Lee,
supra, at 3, citing State v. Maurer (1984), 15 Ohio St.3d 239,250-251. The fact that potential jurors may have been subject to pretrial publicity is not, standing alone, enough to demonstrate prejudice. State v. Hansen (Apr. 7, 1999), 9th Dist. No. 98CA0025, at 6, citing State v. White, 82 Ohio St.3d 16, 21,1998-Ohio-363. If prospective jurors who have been subject to pretrial publicity affirm that they will judge the matter solely on the evidence presented, and not the publicity, there is no error. Hansen, supra, at 6, citing White,82 Ohio St.3d at 21.
 {¶ 55} As in any appeal, Defendant bears the burden of ensuring that the record on appeal is complete. State v.McCowan, 9th Dist. No. 02CA008124, 2003-Ohio-1797, at ¶ 6. In this particular case, not only has Defendant failed to provide this court with a transcript of the voir dire proceedings, but Defendant's counsel stated in the one provided transcript that:
"pragmatically speaking based on * * * the jury pool's reaction to questions, at this point is does not appear that publicity has played a role and is going to play a role in their consideration of evidence."
 {¶ 56} Defendant's counsel reserved her right to raise the motion if something occurred during the course of the trial which altered that perception. Nothing of that sort appears in the record. As Defendant himself has admitted, through counsel, that the jurors in this case were not prejudiced by pretrial publicity, we cannot find that the trial court abused its discretion in denying Defendant's motion to transfer venue. We overrule Defendant's second assignment of error.
 ASSIGNMENT OF ERROR III
"The trial court abuse[d] its discretion by admitting irrelevant and unfairly prejudicial evidence at trial concerning past vehicle defects and inspection violations which were fixed by [Defendant] before the accident."
 {¶ 57} In his third assignment of error Defendant alleges that the trial court erred by admitting evidence of prior vehicle defects and violations which were corrected prior to the accident. Evidence pertaining to conditions on his vehicle which did not exist at the time of the accident, Defendant argues, was inadmissible because it was both irrelevant, under Evid.R. 402, and highly prejudicial, under Evid.R. 403.[13]
 {¶ 58} Evid.R. 401 defines relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In general, relevant evidence is admissible and irrelevant evidence is not. Evid.R. 402. A trial court has broad discretion in admitting evidence, and this court will not overturn its decision on appeal absent an abuse of discretion that materially prejudices a defendant. State v. Wade, 9th Dist. No. 02CA0076-M, 2003-Ohio-2351, at ¶ 8, citing State v. Long (1978),53 Ohio St.2d 91, 98.
 {¶ 59} In this particular case, Defendant argues that evidence of prior vehicle defects which were corrected prior to the accident in question is irrelevant. The State, however, centered its case on the reckless disregard of Defendant for maintaining his vehicle in the proper working order, and for allegedly falsifying repair records. The evidence at trial showed that Defendant had previously been cited for tire defects, and that, while his logs indicated those defects were repaired, at least one of the same tire defects arguably still existed at the time of the next vehicle inspection. The inspections then become relevant because they help to show the disregard Defendant apparently had for repairing known defects: even after notification of tire issues, Defendant still certified they were repaired while it appears they were not. The inspections also tended to show recklessness in that on the same day the inspector placed Defendant's vehicle out of service for defects, Defendant's log actually recorded the status of his vehicle at the end of that day as "satisfactory."
 {¶ 60} Defendant also alleges that the inspections should have been excluded on the basis of Evid.R. 403 because their probative value was substantially outweighed by the danger of unfair prejudice. Defendant states that he "was unfairly prejudiced because the past vehicle defects or violations had nothing to do with the accident and served only to inflame the passions of the jury against him."
 {¶ 61} The probative value to the State in this case was great: the State wanted to illustrate that Defendant was reckless in failing to correct known defects and for allegedly falsifying his logs to show repairs that were never actually done. The inspection reports, coupled with the logs, greatly support such an inference. The danger of prejudice to Defendant is also apparent. However, we cannot say that the trial court abused its discretion by determining that any unfair prejudice was not substantially outweighed by the probative value to the State. We, therefore, overrule Defendant's third assignment of error.
 ASSIGNMENT OF ERROR IV
"[Defendant's] due process rights were violated where the State failed to preserve evidence of the condition of his vehicle and its components for review by the retained defense expert."
 {¶ 62} In his fourth assignment of error, Defendant contends that the trial court erred by failing to preserve the condition of the semi so that his expert could conduct an inspection. Defendant insists that the State ignored a proper request by Defendant to preserve the evidence, and that the State's inspections were not in accord with the subsequent condition of the vehicle. Defendant notes that the State's reports indicated that the air brakes on the third (second drive) axle were inoperable at the time of the accident, yet the brakes on that axle were completely locked up to the point that the tow operator had to disable the brakes in order to tow the tractor to the State's inspection location.
 {¶ 63} The United States Supreme Court has held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Arizona v.Youngblood (1988), 488 U.S. 51, 58, 102 L.Ed.2d 281. Bad faith implies more than bad judgment or negligence; instead, it "imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another." (Internal citation omitted.) Hoskins v. Aetna Life Ins. Co. (1983),6 Ohio St.3d 272, 276. Bad faith on the part of the police must be evaluated from the knowledge of the police regarding the exculpatory value of evidence at the time of the alleged destructive act. State v.Jones (1990), 67 Ohio App.3d 542, 546, citing Youngblood,488 U.S. at 56. If the State acts in bad faith by ignoring a valid request to preserve evidence, the burden shifts to the State to show that the evidence was not exculpatory. State v. Sailors
(Oct.7, 1992), 9th Dist. No. 2723, at 7, citing Columbus v.Forest (1987), 36 Ohio App.3d 169, 173.
 {¶ 64} The evidence in this case shows that, on the night of the accident, the second drive axle on the tractor was completely inoperable. The brake pads were not touching, rendering the brake completely ineffective as an aid to stopping the semi. When Defendant's semi was towed from the scene of the accident, testimony indicated that the second drive axle did not cause any problems for the tow truck driver. At that time, there was no indication that the second drive axle brakes were locked up so as to prevent movement of the semi. In other words, the police did not have any reason to believe that the condition of those brakes were in any way exculpatory for Defendant.
 {¶ 65} After the accident, the tractor was towed to Defendant's step-father's home and left for over two months without further inspection by the State. Defendant filed his motion to preserve the evidence on March 6, 2003. The court never ruled on that motion. The State retrieved the tractor from Ledbetter's property later that same month. Only then did evidence show that a tow truck operator had some difficulty disengaging the second drive axle brakes. Nothing prior to that time would have informed the police that the second drive axle might prove partially exculpatory. Defendant offered no evidence tending to show that the police on the scene at the time the truck was towed knew of the locked condition of the brakes, or the discrepancy existing in the condition of those brakes from the night of the accident. Because the State failed to file a brief in this matter, we have no way of knowing what it would argue in this case. However, the record before us indicates that the police had no reason to know at that time that the condition of those brakes might prove exculpatory. We, therefore, cannot say that the police acted in bad faith in failing to preserve the condition of Defendant's semi. Accordingly, we overrule Defendant's fourth assignment of error.
 ASSIGNMENT OF ERROR V
"The trial court erred by sentencing [Defendant], who had never previously been to prison, to a greater-than-minimum prison term of three years."
 {¶ 66} In his final assignment of error, Defendant argues that the trial court erred by sentencing him to a greater than minimum sentence when he had never served a prison term and had no prior felony record. Defendant asserts that the court erred in determining that the shortest prison term would demean the seriousness of the offense and not adequately protect the public from future crime.
 {¶ 67} This court may remand a case for re-sentencing only if it clearly and convincingly finds that the trial court's findings are not supported by the record or that the sentence imposed is otherwise contrary to law. R.C. 2953.08(G). Clear and convincing evidence is that "`which will produce * * * a firm belief or conviction as to the allegations sought to be established.'"State v. Eppinger, 91 Ohio St.3d 158, 164, 2001-Ohio-247, quoting Cross v. Ledford (1954), 161 Ohio St. 469, 477.
 {¶ 68} R.C. 2929.14(A)(3) requires a prison term of between one and five years for a third degree felony. A court shall impose the minimum sentence authorized unless the court finds that "the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." R.C. 2929.14(B)(2). Where the trial court imposes a greater than minimum sentence, the court must make the statutorily required findings for that sentence at the sentencing hearing. State v. Comer,99 Ohio St.3d 463, 2003-Ohio-4165, at ¶ 26.
 {¶ 69} The seriousness factors which the court must consider before imposing a greater than minimum sentence include whether the physical or mental injury suffered by the victim was exacerbated by her age or mental condition, whether the victim suffered serious physical, psychological, or economic injury, whether the offender intended to cause harm to property or persons, and whether the offender's occupation was used to facilitate the offense. R.C. 2929.12(B). Recidivism factors which the court must also consider include whether the offender had a prior criminal record, whether the offender lived a law-abiding life for a significant number of years, whether the offense was committed under circumstances likely to recur, and whether the offender showed genuine remorse for his acts. R.C. 2929.12(E). The court may also consider any other factors, not included in the statute, which the court finds relevant. R.C. 2929.12(D), (E).
 {¶ 70} The court in this case stated the following at the sentencing hearing:
"The Court has * * * considered the factors in [R.C.] 2929.12
relevant to felony sentencing. Janine Ramer's life was taken by the reckless conduct of [Defendant] on January 6th of this year. Whether or not [Defendant] is genuinely remorseful, and I'm sure there is remorse, but at least two of the eye witnesses at the scene described [Defendant's] reaction to the collision. Perhaps [Defendant] [was] in shock at that time or in disbelief, but both of the witnesses reported to the Court through the Probation Department that [Defendant] did not seem to express a lot of concern about Janine's condition. * * * And the Court [cannot] say that given the condition of the truck on that day that this type of offense was committed under circumstances not likely to reoccur. Given the history of the safety violations and the conditions of the brakes on January 6th of this year, it's likely that [Defendant] [was] driving that truck for some time in that condition. And in the Court's view the minimum sentence in this case would demean the seriousness of the offense. * * * [O]n January 6th a very bright light[, Janine Ramer,] was extinguished by a truck that should not have been on the road. * * * Whatever the sentence the Court imposes this morning, the punishment can not [sic.] ever reflect the gravity of the harm [Defendant] caused * * * by operating a truck weighing in [excess] of 70,000 pounds with a braking capacity of almost 24 percent."
 {¶ 71} The Court specifically found that the minimum sentence in this case would demean the seriousness of the offense, and then detailed the serious nature of the offense as it related to its decision to impose a greater than minimum sentence. This Court does not have before it clear and convincing evidence that the trial court erred in imposing a greater than minimum sentence. Defendant's fifth and final assignment of error is overruled.
 {¶ 72} Defendant's five assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.
Judgment affirmed.
Carr, P.J., and Baird, J., concur.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Carr, P.J. Baird, J. Concur
[1] We note that the State failed to file a brief in this matter.
[2] Kerns testified about five different levels of inspection which he regularly conducted. The level-two walk-around was the most prevalent, amounting to about 40% of his inspections, and did not include checking the braking system of a vehicle.
[3] As a truck driver, Defendant was required to keep a log for every day, even those days on which he did not drive. The log indicated hours on duty, either loading or driving, hours off duty, a record of maintenance performed on the semi, and the results of a walk-around inspection performed both before and after the day's driving. Testimony indicated that an inspection violation that did not place the vehicle out of service would still permit a driver to record a "satisfactory" rating for his inspection. However, exposure of cords in tires and tire tread depth of less than 230 seconds should have been marked as "unsatisfactory" in the log, especially where multiple violations existed.
[4] A driver was generally responsible for making sure the necessary maintenance occurred for all defects and violations noted during an inspection. A repair certification would be signed following each inspection that revealed a defect. That certification, a part of the inspection report, would be sent directly to a state agency which monitored repairs, but no State employee would actually physically go out to re-inspect the vehicle to ensure compliance.
[5] The lack of detail on the November inspection report as to which tire was defective made it impossible to verify that the bald tire the night of the accident was the same tire. The motor carrier certification filed in December claimed to have remedied that defect prior to the accident, though no one testified as to whether the tire had actually been repaired or not.
[6] Neither Defendant, nor his step-father Gregory Ledbetter, who owned the truck, recalled seeing any red out-of-service stickers on either the tractor or trailer after the accident. The tow truck operator, who towed the semi in March of 2003, also did not recall any stickers. In fact, Ledbetter indicated that the trailer was actually placed back on the roads of Ohio two or three days after the accident in order to deliver the load it held. Ledbetter was certain he would have noticed the red stickers, and said they were "pretty hateful [because] [y]ou have to scratch them off because of the adhesive that's used on them."
[7] The Ohio State Highway Patrol did, in fact, take at least two photographs on the night of the accident, both which were admitted into evidence. However, Heard admitted that he had not pursued every available photograph, and had not known those particular photographs existed.
[8] This calculation takes into account the five second change interval and two second clearance interval, less the second it would take Defendant to clear the intersection going between 45 and 50 m.p.h. if he was only 60 feet away from the light when it turned yellow.
[9] This includes the five second clearance interval, two second change interval, and 2.6 to 3.3 second interval it would take Ramer to drive from the stop line into the intersection.
[10] This, of course, depends upon the correct operation of the traffic signal on that day.
[11] According to time and distance numbers testified throughout trial, that would equate to a required stopping time of around 4 or 5 seconds, at least 2 seconds less than the available seven seconds of the clearance and change intervals of this light.
[12] Testimony by Weidinger indicated that Ramer's light could not have been green at the same time Defendant's light was still yellow. Nor was it possible, according to more than one witness, that Defendant, traveling at 45 m.p.h. (65 feet per second) and only 60 feet away from the light when it turned yellow, could not clear that yellow light within the five second change interval and two second clearance interval. This testimony remained unrebutted.
[13] Defendant has not challenged admission of this evidence under Evid.R. 404. We, therefore, will not consider whether the court erred in admitting the inspection reports under that Rule.